[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

---

No. 13-11456
Non-Argument Calendar

---

D.C. Docket No. 3:09-cv-00101-HES-MCR

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

DONALD F. HANKS,
JENNIFER SPANGLER ARNSTEIN,

Defendants-Appellants.

---

Appeal from the United States District Court
for the Middle District of Florida

---

(June 20, 2014)

Before PRYOR, ANDERSON and DUBINA, Circuit Judges.

PER CURIAM:

In 2002, Donald F. Hanks entered into an agreement with the IRS, pursuant to which he would pay off assessed, unpaid income taxes in a series of monthly installments. See generally 26 U.S.C. § 6159 (2012). Within a few years, Hanks had breached the terms of the agreement. The parties agree that the IRS was consequently authorized to terminate the agreement. See id. § 6159(b)(4)(A). Hanks argues, however, that the IRS did not do so properly because it failed to notify him in advance as required. See id. § 6159(b)(5)(A).

In 2009, the government filed suit against Hanks seeking, inter alia, to reduce the unpaid assessments to judgment. The parties agree that this suit was barred if the installment agreement was still in effect. After a bench trial, the district court found that the IRS had properly notified Hanks before terminating the agreement so that the termination was effective and this suit was not barred. Hanks challenges the district court's finding on appeal. We affirm.

I.

The terms of the 2002 installment agreement required Hanks to make monthly payments of $1000 until he had paid off the full amount that he owed for years including 1995 and 1999. The IRS assigned a tax examining technician to monitor Hanks's progress. In March 2004, after paying off only a small fraction of the liabilities covered by the agreement, Hanks notified the IRS that he believed that he no longer owed any money. Hanks testified that he repeated this contention

in monthly letters. In October 2004, his payments began to decline from the required amount of $1000 to as little as $100 by July 2006.

An IRS database contains an entry dated August 16, 2006, purporting to memorialize the termination of the 2002 installment agreement. The parties agree that in order to terminate the agreement, the IRS was required to notify Hanks at least thirty days in advance. See 26 U.S.C. § 6159(b)(5) (2012). At trial, Hanks testified that he was never so notified. The IRS database does not indicate whether Hanks was so notified. A revenue officer testified that at the time of the alleged termination, when tax examining technicians manually monitored installment agreements, they only sometimes recorded the required notification as a separate entry in the database. According to this witness, revenue officers routinely assumed that an entry memorializing termination meant that the agreement had been properly terminated.

In October 2006, the IRS sent Hanks a "refresher" demand letter for years including 1995 and 1999. In November 2006, Hanks responded with a letter asserting that the IRS owed him money, without saying anything about the 2002 installment agreement. Around the same time, Hanks made one final voluntary payment of $100 toward the liabilities covered by the 2002 agreement.[1]

[1] Hanks asserts that he continued to make payments until January 2007. The district court, however, found that the last payment Hanks made in relation to the agreement was in November 2007, and this finding was not clearly erroneous. It is undisputed that Hanks made an additional

In January 2007, the IRS began to levy on Hanks's assets. Hanks called the IRS and, inter alia, indicated that he did not understand why he owed so much. A detailed log of the conversation does not mention the 2002 installment agreement. In February 2007, the IRS began to apply Hanks's involuntary (levy) payments toward the liabilities covered by the 2002 agreement.

In August 2007, the IRS mailed Hanks a letter titled "Annual Installment Agreement Statement." The statement covered a period beginning in July 2006 and ending in July 2007. The statement reflected Hanks's two aforementioned voluntary $100 payments in July and November 2006. It also reflected multiple involuntary (levy) payments between February 2007 and June 2007. The statement indicated that all of these payments were applied against the amount that Hanks owed for 1995.

In October 2007, Hanks delivered quitclaim deeds to two parcels of real property to his future wife and ex-wife, respectively, within days of learning that his ex-wife had talked to an IRS collections official. At some point after August 2006, Hanks also caused title to his boat to be transferred to an entity that was controlled by his stepdaughter. The district court concluded that these transfers were fraudulent, and Hanks does not challenge this conclusion on appeal.

---

voluntary payment in January 2007, but the IRS applied that payment toward a liability that was not covered by the 2002 agreement.

In February 2009, the government filed suit against Hanks in order to, inter alia, reduce the unpaid assessments for years 1995 and 1999 to judgment. Hanks argued, inter alia, that the suit was barred because the 2002 installment agreement had never been properly terminated. See 26 U.S.C. § 6331(k)(3)(A), (i)(4) (2012); 26 C.F.R. § 301.6331-4(b)(2) (2013).

After a bench trial, the district court found that the IRS had properly notified Hanks before terminating the installment agreement.[2] According to the district court, the database entry dated August 2006 created a presumption that the agreement had been properly terminated, rebuttable only by "clear evidence to the contrary." United States v. Chem. Found., Inc., 272 U.S. 1, 14–15, 47 S. Ct. 1, 6 (1926). The court declined to credit Hanks's testimony that he had never received notice, finding him incredible based on his admitted history of tax evasion and his "evasive" and "implausible" responses to questions posed at trial. In particular, the court observed that Hanks had denied receiving various letters from the IRS until, or even though, the IRS produced records to the contrary, including certified mailing logs, database entries, and a signed certified mail receipt.

---

[2] The district court alternatively concluded that Hanks had abrogated the agreement in 2004 when he informed the IRS that he considered his tax debts paid in full and subsequently breached the terms of the agreement. According to the court, Hanks's actions amounted to a constructive request that the agreement be terminated, so that pre-termination notice was not required. See 26 C.F.R. § 301.6159-1(c)(3)–(4) (2006) (amended and renumbered as 26 C.F.R. § 301.6159-1(e)(3)–(4) (2013)). The government eschews this theory on appeal, and we offer no opinion on its merits.

The court also found that Hanks did not believe that the agreement was in place after August 2006. The court observed that after that date, Hanks made only one voluntary payment toward the liabilities covered by the agreement. The court also observed that when Hanks contacted the IRS as it proceeded to levy on his assets, he did not assert that the agreement was still in effect, which, if true, would have barred the levies. See 26 U.S.C. § 6331(k)(2). Finally, the court observed that Hanks had subsequently attempted to protect his assets from government seizure. This appeal followed.

II.

After a bench trial, we review the district court's conclusions of law de novo and findings of fact for clear error. Renteria-Marin v. Ag-Mart Produce, Inc., 537 F.3d 1321, 1324 (11th Cir. 2008). We hold that the district court did not clearly err in finding that the IRS properly notified Hanks before terminating the 2002 installment agreement.

At the outset, we question whether a "presumption of regularity" controls this case. "The presumption of regularity supports the official acts of public officers, and, in the absence of clear evidence to the contrary, courts presume that they have properly discharged their official duties." United States v. Chem. Found., Inc., 272 U.S. 1, 14–15, 47 S. Ct. 1, 6 (1926). "The presumption perhaps is less a rule of evidence than a general working principle." Nat'l Archives &

Records Admin. v. Favish, 541 U.S. 157, 174, 124 S. Ct. 1570, 1581 (2004). For example, when the IRS produces a dated and properly addressed copy of a taxpayer notice, it is sometimes presumed that that notice was sent. See United States v. Dixon, 672 F. Supp. 503, 506 (M.D. Ala. 1987), aff'd mem., 849 F.2d 1478 (11th Cir. 1998). A record certifying that notice was sent on a specific date may also give rise to the same presumption, see United States v. Chila, 871 F.2d 1015, 1019 (11th Cir. 1989), at least where the existence of the notice is not in dispute, see Welch v. United States, 678 F.3d 1371, 1379 (Fed. Cir. 2012).

In this case, however, the government has produced neither a copy of the alleged notice nor a record certifying that notice was sent. The IRS's database entry purports to indicate only that the 2002 installment agreement was terminated. A revenue officer testified that at the time, the issuance and sending of a notice of termination was only sometimes memorialized in a separate database entry when an installment agreement was being manually monitored. This description of the then-existing practice hardly amounts to "proof of procedures followed in the regular course of operations which give rise to a strong inference" that a notice was sent. Godfrey v. United States, 997 F.2d 335, 338 (7th Cir. 1993). We are disinclined to uphold such an inference based on a single ambiguous database entry. Cf. id. at 338–339 (holding that an IRS database entry reflecting a "refund of overpayment" did not establish that a refund check had been issued and sent).

However, the district court's opinion suggests it did not rest on the presumption, and the district court's findings of fact make any reliance on the presumption superfluous. The district court highlighted circumstantial evidence that Hanks had received a notice of termination. The court observed, for example, that as the IRS proceeded to levy on Hanks's assets, Hanks contested his liability but never asserted that the installment agreement was still in effect, even though that would have barred the levies. See 26 U.S.C. § 6331(k)(2) (2012). The court also observed that Hanks made only one voluntary payment toward the liabilities covered by the agreement once it had allegedly been terminated. The court further observed that Hanks engaged in fraudulent transfers after the agreement was allegedly terminated in an effort to shield his assets. Based on this evidence, the court found that Hanks no longer believed that the agreement was in force after August 2006.[3]

In addition, the court observed that Hanks denied receiving various letters from the IRS until, or even though, the IRS produced convincing records to the contrary. The court concluded that this pattern of denial exhibited Hanks's strategic dishonesty. Sitting as factfinder, the court was permitted to infer that

---

[3] Hanks argues that the district court was required to draw an "adverse inference" against the government based on its inability to produce additional evidence that Hanks was properly notified. See generally Callahan v. Schultz, 783 F.2d 1543, 1545 (11th Cir. 1986) (per curiam). We disagree. The government did not refuse to produce evidence that was within its control; rather, it acknowledged that it could not produce any additional evidence. The "adverse inference" rule does not apply.

Hanks was also lying about his failure to receive pre-termination notice regarding the 2002 agreement. “Such an inference is consistent with the general principle of evidence law that the factfinder is entitled to consider a party’s dishonesty about a material fact as ‘affirmative evidence of guilt.’” Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147, 120 S. Ct. 2097, 2108 (2000) (quoting Wright v. West, 505 U.S. 277, 296, 112 S. Ct. 2482, 2492 (1992)).

Hanks asserts that he has a history of exercising his right to administrative appeal and that the fact that he did not do so here indicates that he did not receive the notice in question. See 26 U.S.C. § 6159(e). The district court was not required to accept this argument in light of the aforementioned evidence to the contrary.[4] The court was permitted to infer that the IRS properly notified Hanks before terminating the 2002 agreement.

**AFFIRMED.**

[4] Hanks also argues that the “Annual Installment Agreement Statement” provided to him in August 2007 is evidence that the 2002 installment agreement was still in effect at that time. Hanks observes that the statute requires “each taxpayer who has an installment agreement in effect” to be provided “an annual statement setting forth the initial balance at the beginning of the year, the payments made during the year, and the remaining balance as of the end of the year.” 26 U.S.C. § 6159 note (emphasis added) (Statements Regarding Installment Agreements). Hanks’s argument is unpersuasive. It is undisputed that the 2002 installment agreement was “in effect” at the beginning of the period covered by the 2007 “Annual Installment Agreement Statement.” It would be natural for the IRS to provide a final closing statement at the “end of the year” during which the agreement was terminated. Even if a closing statement was not statutorily required, it was certainly not prohibited by the statute in question and, consequently, is not strong evidence that the 2002 agreement was still in effect in August 2007.

**UNITED STATES COURT OF APPEALS**
**FOR THE ELEVENTH CIRCUIT**

ELBERT PARR TUTTLE COURT OF APPEALS BUILDING
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

John Ley
Clerk of Court

For rules and forms visit
www.ca11.uscourts.gov

June 20, 2014

MEMORANDUM TO COUNSEL OR PARTIES

Appeal Number: 13-11456-EE
Case Style: USA v. Donald Hanks, et al
District Court Docket No: 3:09-cv-00101-HES-MCR

**This Court requires all counsel to file documents electronically using the Electronic Case Files ("ECF") system, unless exempted for good cause.** Enclosed is a copy of the court's decision filed today in this appeal. Judgment has this day been entered pursuant to FRAP 36. The court's mandate will issue at a later date in accordance with FRAP 41(b).

The time for filing a petition for rehearing is governed by 11th Cir. R. 40-3, and the time for filing a petition for rehearing en banc is governed by 11th Cir. R. 35-2. Except as otherwise provided by FRAP 25(a) for inmate filings, a petition for rehearing or for rehearing en banc is timely only if received in the clerk's office within the time specified in the rules. Costs are governed by FRAP 39 and 11th Cir.R. 39-1. The timing, format, and content of a motion for attorney's fees and an objection thereto is governed by 11th Cir. R. 39-2 and 39-3.

Please note that a petition for rehearing en banc must include in the Certificate of Interested Persons a complete list of all persons and entities listed on all certificates previously filed by any party in the appeal. See 11th Cir. R. 26.1-1. In addition, a copy of the opinion sought to be reheard must be included in any petition for rehearing or petition for rehearing en banc. See 11th Cir. R. 35-5(k) and 40-1 .

Counsel appointed under the CRIMINAL JUSTICE ACT must file a CJA voucher claiming compensation for time spent on the appeal no later than 60 days after either issuance of mandate or filing with the U.S. Supreme Court of a petition for a writ of certiorari (whichever is later).

Pursuant to Fed.R.App.P. 39, costs taxed against appellants.

The Bill of Costs form is available on the internet at www.ca11.uscourts.gov

For questions concerning the issuance of the decision of this court, please call the number referenced in the signature block below. For all other questions, please call Lois Tunstall, EE at (404) 335-6224.

Sincerely,

JOHN LEY, Clerk of Court

Reply to: Jeff R. Patch
Phone #: 404-335-6161

OPIN-1A Issuance of Opinion With Costs